**Robert MOSCOSO, Plaintiff,**

**v.**

**THE CITY OF NEW YORK, the Commissioner of the New York City Police Department, Police Officer Christopher Callahan, Shield # 1533 and Unidentified Police Officers, Defendants.**

**No. 99 CIV. 1098(JSR).**

United States District Court, S.D. New York.

April 13, 2000.

Thomas Sheehan, of Cheda & Sheehan, Jackson Heiguts, NY, for plaintiff.

John Queenan, Asst. Corporation Counsel, New York City, for defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

When one person badly beats another, leaving him bloody and battered, may the assaulter escape arrest by simply asserting, without corroboration, that he was acting in self-defense? Common sense suggests otherwise, and the law, as this case illustrates, follows the suggestion.

The facts pertinent to defendants' instant summary judgment motion, undisputed except as otherwise indicated, are as follows. On April 22, 1998, several New York City police officers from the 13th Police Precinct responded to a "911" call reporting a fight in progress at 27th Street and Third Avenue in Manhattan. *See* Declaration of Christopher Callahan ("Callahan Decl.") at ¶ 2. The first two officers to arrive at the scene, Thomas Rindos and Robert Rennie, observed two men, later identified as the plaintiff, Robert Moscoso, and one Li Shing Wang, on the ground, struggling with a hammer. *See* Declaration of Thomas Rindos ("Rindos Decl.") at ¶ 2. By the time the individually-named defendant in this case, officer Christopher Callahan, responded to the scene with his partner, the men had been separated and Wang was sitting on the ground holding a bloody towel to his head and being aided by police officers. *See* Callahan Decl. ¶ 2. Officer Callahan was assigned to investigate and to determine whether an arrest should be made. *See id.* ¶ 3.

Pursuant to those duties, Officer Callahan was informed that a fight involving a hammer had occurred, *see id.*, and that the plaintiff had come to the scene of the fight from the apartment of one Susanna Lau, which was located nearby. *See id.* ¶ 4. Officer Callahan and two other officers proceeded to the apartment to speak to Ms. Lau and to find out if the hammer had come from her apartment. *See id.* Ms. Lau acknowledged that the plaintiff had been at her apartment shortly prior to the fight. *See id.* ¶ 5.

As for Ms. Lau's comments regarding the hammer, the accounts offered by plaintiff and defendants differ markedly. Defendants claim that, in response to questioning by Officer Callahan, Ms. Lau admitted that she kept a hammer in her house, and that when she went to look for the hammer under her sink, it was missing. *See id.* According to Officer Callahan, Ms. Lau described the hammer as a silver hammer with a black handle. *See id.* Later, however, when Ms. Lau was brought to the police precinct to see if she

could identify a hammer recovered from the crime scene, Ms. Lau denied it was the hammer from her apartment. *See id.* ¶ 6. Officer Callahan avers that he nonetheless discredited her statement because the hammer matched her earlier description. *See id.*

Ms Lau's account, however, is different and must be credited for the purpose of defendants' motion, since it supports plaintiff's position. According to Ms. Lau, she never offered a description of the hammer to the Police Officers, nor stated it was missing, but rather showed her hammer to them. *See* Decl. of John F. Queenan, Ex. C, Deposition of Susanna Lau ("Lau Dep.") at 155. She confirms that she failed to identify the hammer she was shown at the precinct house, but avers that her denial of ownership at the precinct was consistent with her statements in her apartment. *See* Decl. of John F. Queenan, Ex. C, Stmt. of Susanna Lau ("Lau Stmt.") at 3.

In any event, it is undisputed that Wang was taken to Bellevue hospital for treatment of his injuries. *See* Callahan Decl. ¶ 7; Declaration of Frederick Moreira ("Moreira Decl.") ¶ 3. While there, he told Officer Moreira that he had rung Ms. Lau's doorbell but had not been buzzed in, and that he had then walked to a payphone on Third Avenue to call Ms. Lau, whereupon the plaintiff "approached him from the side, argued with him, and then struck him with a hammer." Moreira Decl. at ¶ 4.

Moreira returned to the precinct house and informed Officer Callahan of Mr. Wang's statement and of the fact that Mr. Wang had been bleeding profusely from the head. Moreira also gave Callahan a copy of the "memobook" in which he had recorded his conversation with Wang. *See* Moreira Decl. at ¶ 7; Callahan Decl. at ¶ 7. Officer Callahan was also furnished with statements taken by other officers at the scene, including a statement from a witness who had seen the two men fighting and a statement from the doorman who had placed the 911 call. *See* Callahan Decl. at ¶ 7; *id.* Ex. A. Neither of these statements, however, shed light on the question of which man had initiated the fight or which brought the hammer to the scene. *See id.* Ex. A.

For his part, plaintiff told the police that Wang had attacked him and that he had been merely defending himself. *See* Moscoso Dep. at 282. He also claimed that the hammer belonged to Mr. Wang. *See id.* at 287.

After analyzing these competing statements, Officer Callahan determined to arrest plaintiff and, along with Officer Moreira, completed the arrest paperwork, *see* Callahan Decl. at ¶ 4; Moreira Decl. at ¶ 7. Plaintiff was charged with second degree assault and fourth degree possession of a weapon, *see* Declaration of Thomas Sheehan ("Sheehan Decl."), Ex. A. Subsequently, however, a determination was reached not to proceed with the case, and the charges were dismissed on June 8, 1998. *See* Complaint at ¶ 16.

Some months later, plaintiff commenced the instant action, alleging various claims under 42 U.S.C. § 1983 and New York state law against Officer Callahan, the City of New York, and the Police Commissioner of the City of New York. *See* Complaint ¶¶ 17–57. While differing in their particulars, the various causes of action ultimately reduce to claims of false arrest, false imprisonment, and malicious prosecution,[1] attributed in the first instance to the arresting officer, Callahan. The threshold question in such a case is whether there existed probable cause to arrest. "[T]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false

---

1. Any doubt on this score was removed by the instant motion practice. For example, while plaintiff's fourth cause of action seems to allege negligent investigation by the defendants, *see* Complaint at ¶¶ 41–45, plaintiff, in his memorandum of law, explicitly disclaims such and states that "plaintiffs claims are for false arrest and not for negligent investigation." Pl. Mem. of Law at 5.

arrest' whether that action is brought under state law or under § 1983." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996), *quoting Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *see also Bryant v. Rudman,* 933 F.Supp. 270, 274 (S.D.N.Y. 1996); *Dukes v. City of New York,* 879 F.Supp. 335, 340–43 (S.D.N.Y.1995). Similarly, probable cause is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 or cognate state law, unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause. *See, e.g., Dukes v. City of New York,* 879 F.Supp. 335, 341–42 (S.D.N.Y.1995).

■ "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant, supra,* at 852. Because on this summary judgment motion by defendants the Court must consider the facts in the light most favorable to the plaintiff, the Court will assume that only the following undisputed facts could have been reasonably relied upon by Officer Callahan in deciding to arrest the plaintiff: 1) officers arriving at the scene observed the plaintiff and Wang struggling over a hammer; 2) Officer Callahan observed Mr. Wang bleeding profusely from the head; 3) Mr. Wang stated that the plaintiff had approached him from the side and hit him with a hammer; and 4) plaintiff admitted hitting Wang but asserted that he was acting in self-defense and that Wang had brought the hammer.[2] The question then is whether a claim of assault made by one participant in an altercation, supported by evidence of significant injury, can constitute probable cause for the arrest of the other, uninjured, participant notwithstanding the latter's claims of self-defense.

In answering this question, the Court looks to *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123 (2d Cir.1997). In that case, a police officer was approached by a man, Harlice Watson, who was bleeding and carrying a pair of broken eyeglasses. *See id.* at 125. Watson stated that he was a corrections officer, showed the officer his identification, and stated that the plaintiff in that case, Alfred Ricciuti, had attacked him without provocation. *See id.* Based on this statement, the police officer arrested Ricciuti. *See id.* Shortly thereafter, Ricciuti's nephew approached and protested the arrest, stating that his uncle was innocent. *See id.* The officer ignored these protests, and continued on to the station with Ricciuti. *See id.* The Second Circuit, in reviewing the district court's determination that the officer in that case was entitled to qualified immunity, stated the following:

> Although Officer Lopez would have been entitled to believe Alfred Ricciuti's version of events rather than Watson's, he was not required to do so. Given Watson's version of events and his visible injuries, a competent police officer could believe that it was objectively reasonable to arrest plaintiff for the assault that had been committed. The officer was not required to make a full investigation into plaintiff's state of mind prior to taking action. Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making the arrest.... Here, Watson's version of events was plausible, and his credibility was buttressed by the fact that he identified himself [as] a law enforcement officer. Under the circumstances, Officer Lopez had a reasonable basis for believing there was probable cause, and was entitled to qualified immunity in making the arrest notwith-

2. Even for purposes of this motion, this may state the case too favorably to plaintiff, since, given Ms. Lau's relationship with plaintiff, Officer Callahan, even on Ms. Lau's version of

what she said, could have discredited her statements and drawn an adverse inference therefrom.

standing Alfred Ricciuti's protestations of innocence.

*Id.* at 128.

The facts of the instant case are substantially similar to those in *Ricciuti*. While there is the distinction that the complaining witness in *Ricciuti* was a corrections officer, this fact, as conceded by plaintiff at oral argument, *see* transcript, 11/10/99, was hardly pivotal to the Court of Appeals' decision but simply supplied additional buttress to the arresting officer's determination of the plausibility of the victim's account. In virtually every such case of competing accounts, an arresting officer will have to make such determinations, explicitly or implicitly, and they will often turn on little more than observations of demeanor or an assessment of competing probabilities. But such observations and assessments are the bedrock of after-the-fact fact-finding by anyone. If we allow judges and jurors to use such bases to find the facts in reaching final judgments, we necessarily must allow police officers to do likewise in determining whether to arrest.

It is also true that *Ricciuti* considered the issue of probable cause only in relation to the availability of qualified immunity, and not in relation to the determination of probable cause. The two questions, however, though distinct, are closely related: the former involves determining whether the arresting officer reasonably believed that probable cause existed, *see Ricciuti, supra,* at 128; *Bryant, supra,* at 277, while the latter involves determining whether probable cause in fact existed, *see Weyant, supra,* at 852; *Bryant, supra,* at 274. While the Second Circuit in *Ricciuti* did not consider the issue of whether probable cause in fact existed—perhaps because the issue was not considered by the district court, *see Ricciuti v. New York City Transit Auth.,* 1996 WL 15652 (S.D.N.Y.1996)—here there is no impediment to applying the reasoning of *Ricciuti* to that issue.

■ Officer Callahan knew that there had been a struggle over a hammer, that one man was severely injured, that the injured man claimed that the plaintiff had assaulted him, and that plaintiff admitted as much, albeit with an explanation that suggested a defense. From these facts alone, Officer Callahan could infer that the elements of second degree assault (*i.e.* intent and injury with a deadly weapon, *see* N.Y. Penal Law § 120.05(2)) and fourth degree possession of a weapon (*i.e.* possession of a deadly instrument or weapon with intent to use it unlawfully against another, *see* N.Y. Penal Law § 265.01(2)) had been met. Thus, the Court concludes that there was probable cause for the arrest.

■ As the *Ricciuti* Court points out, Officer Callahan was under no duty, once probable cause was found to exist, to credit the plaintiff's protestations of self-defense. *See Ricciuti, supra,* at 128. Under New York law, self-defense is an affirmative defense, *see* N.Y. Penal Law §§ 35.00, 35.15, requiring the defendant to show that he reasonably believed that his force was necessary to prevent what he reasonably believed to be the use of unlawful physical force, *see* N.Y. Penal Law § 35.15(1). On the facts here alleged by plaintiff, Officer Callahan had insufficient basis to assess whether plaintiff's claims that Wang had attacked him were true, let alone a basis for crediting plaintiff's facially unlikely claim that plaintiff's substantial assault on Mr. Wang was a reasonable use of force under the circumstances.

Accordingly, because there was probable cause for arresting the plaintiff, the Court grants defendants' motion for summary judgment as to plaintiff's claims, whether under section 1983 or New York State law, that are predicated on false arrest or false imprisonment. Further, because plaintiff points to no admissible evidence of any facts that came to light after the arrest that would negate probable cause, the Court likewise grants defendants' motion for summary judgment on plaintiff's claims under state and federal law predicated on malicious prosecution. Finally, because this disposes of all claims, the entire com-

plaint is hereby dismissed with prejudice. Clerk to enter judgment.

SO ORDERED.